beyond peradventure that throughout the whole transaction Fellows was acting for Albertson, in order to settle or purchase his mortgage debts which Currey & Hager held against him, and which for some reason they never attempted to enforce. .

Under these circumstances, the fact that Albertson did not complete his payment on September 7th by three o'clock is without significance. Whatever right Currey & Hager might have had to withdraw from their agreement by insisting that time was of its essence, surely Fellows acquired no right to go on with the agreement in his own name as against his principal. Upon Albertson's failure to comply with the terms of the contract which Fellows, as his agent, had procured for him, two courses were open to Fellows, to abandon the compromise or to complete it. In either case the loss or the gain was his principal's. He chose the latter course, and all that he can now ask is to be made whole.

The views thus outlined lead to a radical modification of the decree rendered in the court below. Instead of a decree for the full amount of both mortgages with interest from 1886, less $440, the decree should be for $1,438.20, the amount paid for the mortgages by Fellows, less $440, the amount received by him on account, with interest on the balance from September 7th, 1887, the date of the assignment of the mortgages to Fellows.

The record will be remitted to the court of chancery that the decree may be modified in these respects.

*Decree unanimously reversed.*

---

PETER PEIFFER, appellant,

*v.*

CALEB FRANCIS BATES, executor &c., respondent.

The owner of the equity of redemption in lands cannot create a new encumbrance thereon prior in lien to existing mortgages, by devoting the money produced by the new encumbrance to the improvement of the premises.

Peiffer v. Bates.

On appeal from a decree advised by *Henry C. Pitney, Esq.*, advisory master, who filed the following conclusions:

The bill is filed to foreclose a third mortgage against the defendant Peiffer, who holds the first, second and fourth mortgages, and his wife, who owns the equity of redemption. The mortgages were executed by one Wickman and wife, the latter being owner, and she subsequently conveyed the premises to Mrs. Peiffer under pressure of an action of ejectment by Mr. Peiffer.

The dispute is as to the amount due on the first mortgage, which was originally for $3,000, and was given to the executors of William King, in 1882.

As collateral to this mortgage, the King estate held a policy of insurance upon the buildings, a hat factory, on the premises, issued in the ordinary way to Mrs. Wickman, with loss, if any, payable to the executors of King as collateral to their mortgage. On March 2d, 1885, the premises were totally destroyed by fire, and the insurance company paid the whole amount mentioned in the policy ($3,000) to the executors of King on March 12th, 1885. There was at that time due upon the mortgage for interest $222.

Subsequently, on or about the 8th of April, 1885, the executors of King assigned this $3,000 mortgage to the defendant, Peter Peiffer, upon payment of the sum of $222, the amount of interest in arrears, and Peiffer, in pursuance of a contemporaneous arrangement with Mr. and Mrs. Wickman, advanced to Wickman (his wife still being the owner of the equity) $1,500, which was used by Wickman in erecting on the premises another factory.

The arrangement was that Peiffer was to hold the mortgage as security for the amount which he might advance for building purposes.

There is some dispute as to whether the amount which was advanced for that purpose was $1,200 or $1,500, Wickman claiming that only $1,200 was so advanced, and that the balance of $300 was an ordinary loan for ordinary purposes, and not understood to be secured by the mortgage.

Peiffer v. Bates.

But in the view which I take of the case, it is not necessary to settle which of the parties is right in his contention as to this part of the controversy.

Counsel for defendant concedes that, under ordinary circumstances, payment of the insurance money would be a discharge *pro tanto* of the mortgage, and in this case would have left due only the $222 interest in arrears, and that the mortgage could not be revived by any agreement between the owners of the equity and the mortgagee, to which the intervening encumbrancer was not a party.

This he admits to be the general rule, but he insists that a part of it is, that such arrangement for renewing a mortgage is only void as against the intervening encumbrancer when it is to his prejudice, and he insists that it was not to the prejudice of such encumbrancer in this case, because the money which was advanced by the assignee (and to the extent of which he claims that the lien of the mortgage was revived) was used in making a valuable addition to the premises in buildings which are still existing, and inure to the benefit of the complainant.

He says, and produces evidence tending to prove, that by aid of the $1,500 which he advanced, Wickman was able and did expend $3,500 in such buildings, which have inured to the benefit of the complainant in advancing the value of his security more, as he claims, than the increased encumbrance.

Admitting defendant's contention to be sound in principle, I do not think that the proof makes out his case. No proof was offered as to the market value of the property immediately after the fire, and before the new buildings were erected, from which I can adjudge that the premises were, in point of fact, increased in market value to the extent of $1,500 by the erection of the new buildings.

In further support of his equity, defendant shows, that by the terms of the policy the insurance company had the right at their option, instead of paying the $3,000, to erect new buildings and replace the structure consumed, and that what actually did take place was, if not precisely a performance by the insurance company of their contract in that way, yet what in equity will be

viewed in the same light, and that, under the circumstances, the defendant should be permitted to be subrogated in part to the right of the insurance company.

An examination of the policy will show that the insurance company's option was to actually reproduce the structures destroyed, so that the new buildings would be substantially the same as the old ones.

The assured would not be obliged to accept anything short of such reproduction.

Now, it clearly appears by the evidence that the new structures were not a reproduction of those that were consumed, either in description or in value.

But I do not think that there is any foundation in equity for either of the defendant's contentions.

A revival or renewal of a mortgage or other encumbrance once paid, is tantamount to the execution of a new mortgage and the creation of a new encumbrance.

No authority has been produced to sustain the position that the owner of the equity of redemption can create a new encumbrance on the mortgaged premises, which shall take precedence over the existing encumbrance, by a devotion of the money produced by the new encumbrance to the improvement of the premises and a corresponding increase in their value.

No equity would arise from the circumstance that the security of the encumbrance thereby postponed was actually increased.

In the case in hand, after the insurance was paid, the amount due on the first mortgage was $222; the amount due on the second mortgage was $1,141.28, in all $1,363.28.   On payment of that sum of money, complainant had the right to redeem the premises, and it was not in the power of the owner of the equity to increase that amount without complainant's consent.   That consent was never obtained.   There is no pretence that complainant's testator had any knowledge or in anywise acquiesced in the arrangement between Wickman and wife and Peiffer.   That arrangement, however, I think was binding on the part of Wickman and wife and of Mrs. Peiffer.   At any rate, Mrs. Peiffer affirms its validity, and as against her hus-

Peiffer v. Bates.

band is entitled to hold the first mortgage as security for the $1,500 advanced by him on the strength of its assignment. Let there be a reference to a master to take an account of what is due on each of the mortgages, and to state the priorities upon the foregoing principle—that is, the first mortgage will stand as security as against the complainant for $222, with interest thereon from April 8th, 1885, and as security subsequent to complainant's mortgage against Mrs. Peiffer for $1,500, with interest from date of payment of that money by Peiffer to Wickman, all subject to be reduced by any payments that may have been made, and also for such rents and profits as defendant may have received, if complainant desires to take an account of them.

*Mr. F. M. Olds*, for the appellant, filed the following brief:

This is an appeal from a final decree of the court of chancery settling the priority of and the amounts due, as between the respondent and appellant, on four mortgages, all on the same tract, which is situated partly in the township of Springfield, Union county, New Jersey, and partly in the township of Milburn, Essex county, New Jersey. All the mortgages were duly recorded in both counties.

The foreclosure was brought by the owner of the third mortgage against the appellant, who is owner of the first, second and fourth mortgages, and against his wife, owner of the equity of redemption.

All four mortgages were originally given by Augusta Wickman, then owner of the fee, and her husband, and each was payable one year after its date.

Their original order was as follows: (1) $3,000, to King's executors, September, 1882; (2) $1,000, to Conklin, December, 1882; (3) $2,000, to Bates's executors, February, 1883; (4) $2,000, to Peiffer, December, 1884.

The first two mortgages were given under the following circumstances:

Mr. Wickman was for many years a manufacturer of hats, at Newark, New Jersey. His wife having purchased the mortgaged land, she and her husband removed to Springfield, in

1882, and were desirous of putting up a building on the premises where he could carry on his hat manufacturing business. Material for this purpose, to the amount of $3,000, was supplied by the lumber firm of William King, of Newark, and the money paid for the same was taken from the estate of William King, deceased, and the first mortgage given to his executors.

. William King, to whose estate this first mortgage was given, was, at the time of his death, June 3d, 1882, associated with his sons-in-law, Joel W. Hatt and Edward L. Conklin, in the sash, blind and lumber business, under the firm name of William King, and after his death the business was continued by the surviving partners under the same name.

Afterwards, the Wickmans, still needing more building material, Mr. Conklin paid his firm $1,000 for more material for the Wickman hat factory, and took the second mortgage individually.

It does not appear in the case for what respondent's mortgage was given.

Appellant's original (the fourth) mortgage, was for cash loaned by him to Mr. Wickman for use in his business. Peiffer also had an account against Mr. Wickman for hat bodies formed for him.

All four mortgages contained the usual insurance clause. Except as to amount, the insurance clauses in the King and Bates mortgages were identical, namely :

"That the said party of the first part shall and will keep the building erected and to be erected upon the land above conveyed, insured against loss or damage by fire, in some safe and responsible insurance company or companies, to an amount not less than $2,000, and assign the policy or certificate thereof to the said party of the second part as collateral security for the payment of the principal and interest aforesaid ; and in default thereof it shall be lawful for the said party of the second part to effect said insurance, and the premium or premiums paid for effecting the same shall be a lien on the said mortgaged premises, added to the amount of the said bond or obligation and secured by these presents, payable on demand with lawful interest."

But one insurance policy was ever taken out, to wit, one for $3,000, obtained by Mrs. Wickman, the owner of the property,

in her own name, and endorsed " loss, if any, payable to William King, mortgagee, as his mortgage interest may appear." This insurance policy was delivered to, and held by, the King executors as mortgagees.

The value of the buildings on the mortgaged premises would have warranted further insurance, but neither Conklin nor Bates secured any.

Shortly after the fourth mortgage was given, namely, on March 2d, 1885, the factory buildings on the mortgaged premises were totally destroyed by fire. Three thousand dollars, the amount of the insurance, was, on March 12th, 1885, paid by the insurance company to King's executors. Both Edward Conklin, as attorney for the King estate, and Mrs. Wickman, as owner of the property, receipted to the insurance company for this $3,000.

This $3,000 was receipted for to the insurance company in a careful and guarded manner, and was not at the time applied on the bond and mortgage, because the King executors had been requested by Mrs. and Mr. Wickman to use the whole, or some part of the insurance money, in replacing the buildings; and they held the money pending consideration of the matter. After some consideration, the executors declined such request, and the Wickmans then applied to the appellant, who, being desirous of saving his fourth mortgage and other claims by keeping Mr. Wickman's business going, agreed to advance $1,500 toward reconstructing the buildings, and to take an assignment of the King mortgage and hold it as security for whatever amount he should actually advance toward restoring the buildings. The executors of King assented to this arrangement, and, on April 8th, 1885, assigned their mortgage to the appellant and received from him the sum of $222, the balance then due on it. The expressed consideration of the assignment was $3,222, that being the whole amount then due on the $3,000 mortgage. As part of the same transaction, and on the same day, the appellant purchased from Conklin and took an assignment of his mortgage, paying him $1,141 therefor, that being the full amount of principal and interest then due thereon. This whole arrangement between the King estate, the Wickmans and Mr. Peiffer was con-

summated under the advice and in the presence of counsel. And counsel advised Peiffer that the King mortgage would be a valid first lien in his hands for all moneys he should advance toward replacing the buildings.

After receiving and recording his assignments of the King and Conklin mortgages, appellant advanced the sum of $1,500 toward the erection of new factory buildings on the mortgaged premises. Mrs. Wickman knew all about the arrangement and her husband's dealings generally with her estate, and he was authorized to act for her in this matter. It does not affirmatively appear that respondent had any knowledge of the transaction at the time.

Peiffer's $1,500 got the new factory buildings well under way. Without such initial help Wickman could not have put up his new buildings.

Mr. Wickman afterwards contributed himself the further sum of $3,500 out of his own business to complete the buildings.

The buildings, as finally replaced, were sufficient for Mr. Wickman's purpose in manufacturing hats.

The new buildings thus cost $5,000. They were not, perhaps, worth as much as those which were burned. The latter were worth, according to Conklin, $4,500, and $4,000 according to Peiffer, while Wickman says that he originally put $8,000 into them; and his statement may be true, considering that the King and Conklin mortgages, amounting to $4,000, were for building materials for such burned factories.

Under pressure of foreclosure and ejectment proceedings by Mr. Peiffer, in 1887, Mrs. Wickman conveyed the mortgaged premises to Mrs. Peiffer.

The case does not show that any of the mortgagees ever expressed any desire of converting or collecting their securities, prior to the time of the fire, nor afterwards, until the beginning of said proceedings in 1887. Complainant did not begin suit until April, 1888, although no interest was paid him after February, 1885.

The bill charges that the King mortgage was paid and was kept open of record on purpose to defraud complainant. On the

hearing it was contended by complainant, that the receipt by the King executors of this $3,000 insurance money was a payment of the mortgage to that extent, and that as against him the mortgage could not be kept alive or revived or continued in force except for the $222, balance due thereon when the appellant bought it, with interest thereon from that date.

Advisory Master Pitney agreed with this view, and advised a decree that there was due to Mr. Peiffer on the King mortgage the sum of $222, with interest, amounting to $270.52, and that Mr. Peiffer could not hold that mortgage as against complainant for any further sum. The decree also adjudges that there is further due to the appellant on this King mortgage the sum of $1,500, with interest, but that this sum is subsequent to the lien of respondent's mortgage. From as much of the decree as so adjudges the appellant has appealed to this court.

(a) *Reception of insurance money by the mortgagees was not, ipso facto, a payment to them.*

*First.* Only mortgagor's interest in the property was insured.

Where a mortgagor insures property and makes the loss payable to the mortgagee, it is the interest of the mortgagor which is insured, and the contract is with him. He can bring an action on the policy in his own name and for his use with or without the consent of the mortgagee. *Martin* v. *Franklin Fire Insurance Co., 9 Vr. 140; S. C. on appeal, 11 Vr. 568 (570); Jackson* v. *Turrell, 10 Vr. 329 (334); Warbasse* v. *Insurance Co., 13 Vr. 203 (206); Friemansdorf* v. *Watertown Insurance Co., 9 Biss. 167; S. C., 1 Fed. Rep. 68, 19 Myers Fed. Dec. 491.*

*Second.* Proceeds of insurance mortgagor's property.

The proceeds of the insurance are not the property of the mortgagee, but of the mortgagor. If the debt is not due, the mortgagee cannot appropriate the avails of the policy toward the payment of his debt without the consent of the mortgagor.

*Jones on Mortgages (2d ed.) § 410,* says: "When the mortgaged property is insured for the benefit of the mortgagee, such insurance is collateral to the debt, and money received from the insurance is still collateral, and cannot be applied by the mort-

gagee to payment of the mortgage debt without the consent of the mortgagor. If the debt be not due, the mortgagee has no right to demand payment, and upon default to convert securities." See, also, *Austin* v. *Story, 10 Grant's Ch. (U. C.) 306 (1863); Gordon v. Ware Savings Bank, 115 Mass. 588 (1874); Fergus* v. *Wilmarth, 117 Ill. 542 (1886)*.

*Third.* Mortgagee holds policy as indemnity against impairment of his security.

Making the loss payable to the mortgagee is a guarantee against any impairment of his mortgage security by fire.

*1 Hilliard on Mortgages 256,* says: "And the mortgagor may effect insurance payable to the mortgagee which is an insurance of the mortgagor's interest, with an irrevocable power of attorney or assignment to the mortgagee as a further security to receive the insurance."

*King* v. *State Insurance Co., 7 Cush. 1 (5),* says: "When the mortgagor causes insurance to be made on the mortgaged premises payable to the mortgagee in case of loss, in that case it is the mortgagor's interest in the subject which is insured, with an irrevocable power of attorney; in legal effect, an assignment to the mortgagee as additional collateral security to receive the avails of the loss, if one happens."

In *Bates* v. *Equitable Insurance Co., 10 Wall. 33 (36),* the supreme court of the United States, *per* Miller, J., say: "Now, it is a well-known and frequent thing in insurance business for a person to insure his life or his property, and either in the policy itself, or by endorsement at the time it is made, or by subsequent endorsement, to which the consent of the company is generally required, to direct the loss to be paid to some third party. This transaction is a very common mode of furnishing a species of security by a debtor to his creditor, who may be willing to trust to the debtor's honesty, his skill and success in trade, but who requires indemnity against such accidents as loss by fire or the perils of navigation. The property of the debtor at risk being thus insured for the benefit of the creditor, gives him this indemnity."

And the mortgagee is the agent of the mortgagor to receive

the insurance money.  *Wood F. Ins.* § *863;  Carpenter* v. *Provident Insurance Co., 16 Pet. 495; Martin* v. *Franklin Insurance Co., 9 Vr. 140 (143).*

*Fourth.*  Collecting avails of insurance, the mortgagee holds it as he held the policy.

If mortgagee receive insurance money, he holds it just as he held the policy itself, with the same lien on the money as he had on the policy—nothing more, nothing less.  *Jones Mort.* § *708; Austin* v. *Story, 10 Grant's Ch. 306.*

It follows, for example, that if insured property, after destruction, be repaired by the mortgagor, or others than the insurance company, so as to make it as good as before the fire, the mortgagee, although the loss was made payable to him, cannot recover on the policy.

In *Friemansdorf* v. *Watertown Insurance Co., 9 Biss. 167,* Judge Blodgett, at page 172, says: "The purpose of the insurance policy, made in favor of the mortgagee, is to prevent any impairment of the mortgagee's interest in the property, and if the property is made as good after the fire as it was before, by other persons than the insurance company, no right of action against the company exists."

*Fifth.*  Result of foregoing rules.

Appellant's insistment that the mere reception by these mortgagees of the $3,000 insurance money was not necessarily a payment on their mortgage, follows, logically, from the four rules above stated.   It was not a payment by mere force of law, and certainly it was not treated as a payment in fact by the parties at the time.   Simultaneous or subsequent agreement between the parties, or rightful application of the money by the mortgagees, was necessary to make it a payment.   The mortgage was due at the time of the fire, that is, it was a mortgage drawn in the usual way for one year, which year had expired two years before, but no demand for payment or proceedings to enforce it had been taken.   And when the insurance money was received by the mortgagees they did not apply it on the mortgage, or in any way treat it as a payment, but held it, pending the consideration of the proposition of the Wickmans to use it in replacing the build-

ings. When they decided that they did not care to have the mortgage continued, they did not even then apply the insurance money on the mortgage, but agreed that they would transfer the mortgage to Peiffer, who would take their place and advance money to replace the buildings. One thousand five hundred dollars were so advanced and used, and by that means Mr. Wickman was enabled to put up a building on the premises costing $5,000.

Could not the mortgagees themselves, with the consent of the mortgagor, have replaced the destroyed buildings and held their mortgage as before? Could they not have allowed the mortgagor to do the same thing, and handed him the money for that purpose? Could they not have used a part of the money as well as the whole of it for such purpose, their mortgage being kept alive only to the extent of the money advanced? And after they had done so, and had a valid security in their hands for that amount, could they not have assigned the mortgage to Peiffer? And does it make any difference that Peiffer (who was not a mere volunteer, but who had a vital interest in keeping up the productive capacity of the property), at the urgent request of the common debtor, stepped in, took an assignment of the security, and advanced the money necessary to begin restoration of the buildings? Should he not be allowed to hold such security as a first lien to the extent of the money advanced?

(b) *Even if the reception of this $3,000 insurance should be considered a payment on account of the mortgage, it is still equitable, under the circumstances of this case, that the mortgage should be revived or continued in force to the extent of the money used in replacing the burned buildings.*

*First.* It is well settled in New Jersey and elsewhere that a mortgage, although paid, may be kept alive and used as security for another loan, unless the rights of intervening encumbrancers are thereby injuriously affected. *Jones Mort. (2d ed.)* §§ *940, 944, 948; Robinson* v. *Urquhart, 1 Beas. 515, 525; Large* v. *Vandoren, 1 McCart. 208 (211); Hoy* v. *Bramhall, 4 C. E. Gr. 563 (567, 573); Traphagen* v. *Lyons, 11 Stew. Eq. 613 (615, 616, 617).*

*Jones on Mortgages* § *948:* "Generally, the chief difficulty in reviving or continuing in force a mortgage which has been paid is on account of the intervening rights of third persons which would be thereby injuriously affected."

*Second.* The intention of the parties, whether to pay or keep alive the mortgage, governs. *Champney* v. *Coope, 32 N. Y. 543 (551)*; *Hubbell* v. *Blakesley, 71 N. Y. 63 (70)*; *Hall* v. *Southwick, 27 Minn. 234 (235).*

In *Champney* v. *Coope,* Davis, J., says: "We have seen that the doctrine is well settled by authority in relation to mortgages, that, if the amount due thereon is paid, the intent of the person in making such payment, whether to extinguish or keep alive the security, will govern."

And in *Hubbell* v. *Blakesley,* Rapallo, J., says: "But even had the payment been made by Charles Burgess [mortgagor] out of his own means, yet if at the time of payment it was agreed that the mortgage should not be extinguished, but should be kept alive and be transferred to another creditor of the mortgagor, and payment was made and received on that condition, the agreement would, under the reasoning of *Champney* v. *Coope,* have been valid, and such payment would not have extinguished the mortgage, and the creditor to whom the mortgage was assigned, in pursuance of such arrangement, could enforce it."

*Hall* v. *Southwick* puts the rule thus: "In this transaction, the actual intention was not to pay and satisfy the mortgage, but to substitute another holder in the place of the original mortgagee and keep it alive. If what was intended would perpetrate a fraud on any person, equity might, in favor of such person, in order to defeat the fraud, give an effect to the transaction different from what was actually intended."

*Third.* In this case the junior encumbrancer is not injuriously affected.

As we have seen, when the insurance company delivered the $3,000 to the mortgagees, they did it on the joint receipt of the mortgagee and mortgagor. Neither party treated the delivery of that money at the time, or even afterward, as a payment on account of the bond and mortgage. It was held pending nego-

Peiffer v. Bates.

tiations as to what arrangement should be made that should be for the best interests of all concerned. The mortgagees finally elected to retain the money. Under the advice and in the presence of counsel they assigned their mortgage to Mr. Peiffer, with an understanding that Mr. Peiffer should hold it as a lien to the extent of the amount which he should advance in restoring the burned buildings. The buildings before the fire were worth, say from $5,000 to $7,000. Although the premises would have warranted insurance above that actually effected, Bates, the respondent, neglected to obtain any. The factory buildings being totally destroyed, all that security was swept away. His mortgage was still subject and subsequent in any event to the $222, balance of the King mortgage, and to the $1,141 due on the Conklin mortgage. The premises had lost their productive capacity, and Mr. Wickman's means of livelihood were gone. Mr. Peiffer's fourth mortgage suddenly became worthless. If Mr. Wickman could not continue in business, there would be no means of securing that, or his merchandise account. The holders of the insurance are unwilling to put any of it back on the land. Foreclosure of all the mortgages was inevitable. At this juncture there comes forward, not a volunteer, but a person with the equities of one having a right to attempt to re-establish his own securities, who, for his own good, as well as that of the common debtor, advances $1,500 toward replacing the burned buildings. Mr. Wickman expressly states that without initial help from some source the buildings could not have been replaced. With the help that came from Peiffer they were enabled to start their new buildings and afterward to put into them an additional $3,500, making a total of $5,000 of value that was put back upon the land. Without Peiffer's help there would have been no new buildings on the land. The respondent would have had a mortgage on the naked land subject to the Conklin mortgage, $1,141, and $222 due on the King mortgage. He now has a mortgage on the land and also upon the buildings costing $5,000, subject to an additional prior claim of $1,500 only. He has $5,000 more security and only $1,500 added encumbrance.

In effect, $1,500 of the insurance money is used for the pur-

pose for which the insurance was made, and for which the policy was assigned to the mortgagees, namely, the restoration of the impaired security.

(c) *Precedents in point.*

The principles above stated have been applied in several cases similar to the present, and the same conclusion reached as is here contended for. See *Austin* v. *Story, 10 Grant's Ch. (U. C.) 306 (1863); Gordon* v. *Ware Savings Bank, 115 Mass. 588 (1874); Connecticut Mutual Life Insurance Co.* v. *Scammon (U. S. C. C. of Ill. 1880), 4 Fed. Rep. 263; S. C., 9 Myers Fed. Dec. 166; Fergus* v. *Wilmarth, 117 Ill. 542 (1886).*

In *Austin* v. *Story,* the mortgagor had effected insurance in his own name, making the loss payable to the mortgagee. A fire occurred before the mortgage fell due and the mortgagee received the amount of the insurance. On foreclosure, subsequently, the mortgagor contended that he should be credited with the interest on the amount of the insurance money from the time it was received by the mortgagee.

In the report of the case it is stated: " Mr. Roaf, for the plaintiff, referred to *Davidson's Precedents 784, note f,* where it is said ' it is not very usual and it is not very fair toward the mortgagor to stipulate that moneys received under the insurance shall be applied in payment of the debt, as such an application may leave the mortgagor without the means of rebuilding his premises. Insurance moneys ought to be applied in replacing the parties in the situation in which they stood before the fire, and such is the rule in the absence of special stipulation.' "

And Van Kanghret, C., says: " I agree with Mr. Roaf that, under the circumstances of this case, the mortgagee is entitled to interest (on his mortgage) without any abatement, in consequence of his holding the insurance money paid over to him in respect of a part of the mortgaged premises. The insurance money stands, or should stand, in lieu of so much of the security as it covers, and should properly be used to replace the property in the position, as nearly as possible, in which it was at the time of the fire. The mortgagee is entitled to have his security kept up in full by it as far as it will go; the mortgagor is entitled to

have it expended on the property. The mortgagee, unless by express stipulation, cannot, I apprehend, himself lay out the money, at all events when he is not in possession of the premises; neither, I think, can he use it in any other way without the consent of the mortgagor."

*Gordon* v. *Ware Savings Bank, 115 Mass. 588,* is almost identical with the present in its facts, and is the leading case. Here there was a first mortgage for $3,300, given to the savings bank to secure a note *payable on demand,* and a second mortgage on the same premises to the plaintiff for $1,579 ; and insurance had been taken out by the mortgagor, " payable, in case of loss, to the Ware Savings Bank, mortgagee, as its interest shall appear."

After the giving of the second mortgage, the buildings were partly destroyed by fire, and $500 was paid by the insurers to the savings bank, and this $500 was endorsed on the note by a teller in the bank, as received on account of the principal, and also so entered on the books of the bank. This entry and endorsement, soon after it was made, came to the knowledge of the treasurer of the bank, who had the general charge of its business. The mortgagor did not know of this endorsement at the time it was made, but learned it soon afterwards, and when he so learned it, he claimed that the $500 should be given to him to be used by him in repairing the buildings. It was not, however, paid to him at once, but it was agreed that if he did repair the buildings, it should then be given to him. Thereupon he did repair the buildings, and the $500 was then paid to him, and he erased the endorsement on the note, and made the following memorandum : " This endorsement on principal erased by me, and the amount of the note is the same as originally made, $3,300."

Subsequently, the savings bank, under the power of sale in the mortgage, sold the mortgaged premises, and accounted for the sale to the mortgagor on the basis that the amount due on the note was $3,300.

The plaintiff's (the second) mortgage was in the handwriting of the treasurer of the bank, and was acknowledged before him as magistrate.

The plaintiff contended that the payment of the insurance to the bank was a payment of the mortgage to that extent, and that the mortgage could not be revived.

The court say, *per* Wells, J.: "The plaintiff, by virtue of his second mortgage, acquired no right to or interest in the policy of insurance. His bill in equity must be maintained, if at all, upon one of two grounds. 1. That the receipt of $500 by the complainant operated as an absolute payment *pro tanto* of the mortgage. 2. That in equity the money received from the insurance ought to be appropriated for the relief of the second mortgagee.

"We are of opinion that the bill is maintainable on neither ground. 1. The insurance was for indemnity to the mortgagor as well as for the mortgagee. To the mortgagee it was for protection of the security, not for the payment of the debt. It was collateral to the debt. Money received from the insurance took the place of property destroyed, and was still collateral until applied in payment by mutual consent, or by some exercise by the mortgagee of the right to demand payment of the debt, and upon default of payment, to convert the security.

"There was no such consent by the mortgagor; and the facts do not show that the money was received and endorsed upon the note with any intention to exercise the right to convert the security for the payment of the debt. This endorsement was erased, and the money appropriated to its original purpose, to wit, the restoration of the security. Both mortgagor and mortgagee treated the endorsement as a mistake, or as unauthorized; and we see no reason why they might not properly do so. 2. The money having been properly applied to the restoration of the impaired security, for the benefit alike of all persons interested, there are no equities in favor of this plaintiff which entitle him to appropriate that benefit exclusively for his own use. On the contrary, it would be inequitable, even if such were his legal right, by reason of the endorsement of the money in the first instance upon the note."

The Massachusetts case (*Gordon* v. *Ware Savings Bank*) has

been since approved in the two cases above cited : *Connecticut Mutual Life Ins. Co.* v. *Scammon* and *Fergus* v. *Wilmarth.*

In the *Scammon Case* a mortgage was given by a life-tenant and the owners of the fee jointly, the life-tenant being in possession and enjoyment of the property. A fire occurred, and the life-tenant arranged with the mortgagee to take the insurance money and replace the building. He did not do so, but squandered it. The remainder-men answered the foreclosure bill, and claimed that this insurance money should be credited on the mortgage, as they did not know of its payment to the life-tenant by the mortgagee.

The court, *per* Dyer, J., upheld this defence, saying : "The case at bar is distinguishable from *Gordon* v. *Ware Savings Bank, 115 Mass. 588,* which was cited by the learned counsel for the complainant on the argument. That was a case where mortgaged premises were injured by fire, and the loss was paid by the insurers, in pursuance of an agreement with the mortgagor, to the first mortgagee, who subsequently paid the amount to the mortgagor, to be applied in repairing the premises so as to make them as valuable as before the fire. The facts were, that at the time the first mortgagee received the insurance money the debt was not due, and the mortgagor did not consent to the application of the money on the mortgage; and, moreover, and as a controlling feature of the transaction, the money was applied by the mortgagor to the restoration of the impaired security, for the benefit alike of all parties interested. These circumstances of course vitally affected the equities of the second mortgagee."

In *Fergus* v. *Wilmarth,* also, the Massachusetts case is cited and approved. Fergus and his wife executed a trust deed to one Furness to secure a note for $12,000, payable to Wilmarth. The trust deed had an insurance clause, and Fergus, the mortgagor, took out an insurance in his own name, making the loss payable to Furness as trustee. In the great Chicago fire of 1871, the mortgaged buildings were destroyed, and the trustee received from the insurance company a draft for $7,500, payable to himself as trustee, and this he deposited in a bank which subsequently failed. After the failure the bank's receiver paid two

dividends to the trustee amounting to $3,000, all of which money was paid over to the mortgagor, or for his benefit, or upon his account, toward the erection of a new building.

On foreclosure of the mortgage, it was held that none of this insurance money should be credited on the mortgage, and the court say : "Fergus insisted that the money should be paid over to him, to be used in the construction of a new building. It would not have been right for the trustee to have turned over to the mortgagor either the whole amount at once, or different portions of such amount at different times, unless its application to the erection of a new building, and thereby a consequent increase in value of the security, could have been in some way made certain. As the principal was not due, and no default had been made in the payment of interest, the trustee could not apply the fund to the reduction of the debt without the consent of Fergus. The views here expressed are in harmony with those of the opinion in *Gordon* v. *Ware Savings Bank, 115 Mass. 588.*" See, also, *Wood F. Ins. 297.* Also, *Jones Mort.* § *410.*

(d) *Respondent's position is based on the bald statement of the following equitable rule, without due attention to its qualifications :* "*Where a creditor has a claim on two funds, on one of which another person has also a claim, and such other person will be prejudiced by allowing the creditor to satisfy his debt out of the fund subject to both claims, equity will compel the creditor, in the first instance, to resort to the fund to which he alone has a claim, if it can be done without injustice to him or the common debtor.*" *Abbett* v. *Powell, 6 Sawy. 91 (95)*; *S. C., Myers Fed. Dec. 228*; *Story Eq.* §§ *553–560, 633 et seq.*

*First qualification.*—The very foundation of the rule is that the owner of the one fund will be prejudiced. *Story Eq.* §§ *558, 633.*

*Second qualification.*—The rule does not apply where it will work injustice to the common debtor. *Story Eq.* §§ *542, 560.* See, also, *Pom. Eq.* § *1414.*

(e) *Respondent negligent in not securing insurance for himself.*

It appears affirmatively in this case, as we have seen, that the premises could have borne more insurance than $3,000, and there

was an insurance clause in respondent's mortgage. Therefore he could and should have secured himself by getting a policy as additional collateral security.

Having neglected to do so, he now comes into a court of equity and insists that he shall get the full benefit of the insurance effected in favor of the King estate, and get this notwithstanding that $1,500 of it has been again put back upon the land. It is submitted that such a result is highly inequitable.

(f) *Maxims applicable:*

" Where the equities are equal the legal title must prevail."

" He who asks equity must do equity."

*Mr. Garret Berry*, for the respondent.

Per Curiam.

This decree unanimously affirmed, for the reasons given by the advisory master.

---

Lorenzo Troxell, appellant,

*v.*

Elizabeth Silverthorn et al., respondents.

S. gave a bond of $3,500, which was afterwards assigned to his wife, and one of $1,500 to T., to pay certain creditors, both of which were secured by a mortgage on his lands, in which mortgage his wife did not join. The lands were worth about $3,000. T. began a foreclosure of the mortgage, and his solicitor obtained from S.'s wife a release of her dower, by representing to her that she would thereby receive from the increased price realized at the fore-closure sale two dollars for every dollar that T. received. She was an unedu-cated woman, and entirely unfamiliar with business affairs or the conveyance of lands, living away from her husband at the time, and had no opportunity to consult with other counsel, or to inquire of anybody as to the legal effect of her executing the release. The solicitor was also her husband's solicitor in a litigation then pending, and she talked with him about her buying in the mortgaged premises at the sale. After the release was executed, T. paid $580